2025 IL App (1st) 251977-U

FIRST DIVISION
December 22, 2025

No. 1-25-1977B

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee | ) ) | Cook County. |
| v. | ) ) | Cir. Ct. No. 25CR0720801 |
| STEPHANIE GALARZA, | ) ) | Honorable Ursula Walowski, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's order denying the defendant's request for pretrial release where the pretrial detention proceedings were fairly conducted, and where the State established by clear and convincing evidence, and the circuit court sufficiently articulated in its detention order, the defendant posed a clear and present threat to the safety of the community and no condition or combination of conditions could mitigate that threat.

¶ 2    The defendant, Stephanie Galarza, appeals from the circuit court's May 26, 2025, and

September 17, 2025, orders, directing that she be detained pretrial under article 110 of the Code of Criminal Procedure of 1963 (725 ILCS 5/110 (West 2022)), as amended by Public Act 101-652, commonly known as "the Safety, Accountability, Fairness, and Equity-Today (SAFE-T) Act" or the "Pretrial Fairness Act" (Act). See Pub. Acts 101-652, § 10-255 (eff. Jan. 1, 2023); 102-1104, § 70 (eff. Jan. 1, 2023); Ill. S. Ct. R. 604(h)(1) (eff. Apr. 15, 2024); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). On appeal, the defendant challenges her pretrial detention arguing: (1) that her detention and motion for relief hearings were improperly conducted; and (2) that the State failed to present by clear and convincing evidence, and the circuit court erred in determining and articulating in its written detention order, that she posed a real and present threat to the safety of the community and that no less restrictive conditions could mitigate that threat. For the following reasons, we affirm.

¶ 3                                II. BACKGOUND

¶ 4      The defendant was arrested on May 24, 2025, and charged together with the codefendant Christopher Hickey (Hickey)[1] with aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2022)), robbery (720 ILCS 5/18-1(a) (West 2022)) and vehicular hijacking (720 ILCS 5/18-3-(a) (West 2022).

¶ 5       On May 26, 2025, the State filed a petition seeking the defendant's pretrial detention. On that same date, the circuit court held a joint and simultaneous detention hearing for defendant and Hickey. At that hearing, the State proffered that at about 3:30 a.m. on April 27, 2025, various home surveillance cameras captured the following events. The victim, who was driving home from a bar in his gray Dodge Ram pickup truck, stopped at 2921 West 56th Street to make a phone call.

---

[1] Hickey is not a party to this appeal.

The defendant and Hickey drove by in a blue minivan.[2] After observing the victim inside the truck, they drove one block past, turned a corner, and parked. The pair exited the minivan and split up. The defendant, who wore a distinctive patterned hoodie, walked back down the street that the minivan had just driven on, while Hickey, wearing a green T-shirt underneath a zip-up hoodie, ran, with a distinctive and athletic gait, along the path of travel in the direction of the victim.

¶ 6        As the victim exited his truck and locked it, he encountered Hickey on the sidewalk. Hickey knocked the victim to the ground and struck him several times. The defendant approached and also began striking the victim multiple times. She then went through the victim's pockets and clothing and took his Galaxy cell phone, wallet, an envelope containing cash, and his car keys.

¶ 7        The defendant subsequently got into the driver's seat of the victim's truck, while Hickey fled on foot in the direction of the blue minivan. The pair eventually met up and worked in unison to relocate both vehicles to the alley behind the defendant's house. Once there, they ransacked the truck for valuables, with the defendant taking cash and tools from it, and then left the truck in the alley.

¶ 8        Approximately two and a half hours later, the pair was captured on Walmart surveillance camera footage parking the blue minivan in the Walmart parking lot and entering the store in the same clothing they had worn during the robbery. The defendant and Hickey then proceeded to an EcoATM, where Hickey used his Illinois State identification card (ID) to exchange the victim's cell phone for cash. This transaction was confirmed with Hickey's thumbprint and a photo that the EcoATM took of both the defendant and Hickey during this exchange.

¶ 9        The morning after the offense, a neighbor called in a complaint to police about a truck parked in the alley behind the defendant's residence. When officers arrived to investigate, they

---

[2] The minivan was registered to the defendant's downstairs neighbor.

learned that the truck had been reported stolen. Because the victim's car was located behind the defendant's residence, officers used the name from that address to search for the defendant's and Hickey's phone numbers. When they did so, they were tipped off to the EcoATM transaction involving Hickey. Officers pulled the EcoATM records, which contained the Galaxy cell phone International Mobile Equipment Identity (IMEI) of the victim. After officers recovered the cell phone and located the victim, the victim identified the phone as his own and told the police that it was taken from him on the date of the incident.

¶ 10    The defendant was arrested on May 24, 2025, and made post-*Miranda* admissions. She identified herself in multiple still images of surveillance footage from Walmart and the home surveillance cameras, and she admitted that she went through the victim's pockets and took money from him. She said that she had been in a bar with the victim, where she had been paying for his drinks, and that he owed her money. She also stated that she and Hickey drove down the victim's street because she had seen the address on the victim's ID when he took it out of his wallet in the bar.

¶ 11    Hickey also made admissions regarding the robbery and stated that he took the victim's cell phone.

¶ 12    The State further proffered that as a result of the battery, one of the victim's front teeth was knocked out. The victim did not seek medical attention because he had no insurance and lacked funds for treatment.

¶ 13    After the proffer, the State noted that the defendant had "no publishable background." It then discussed Hickey's criminal history, which included two prior felony convictions for which he received probation (a 2019 robbery and a 2017 possession of a stolen motor vehicle) and a 2006 misdemeanor conviction for consumption of alcohol by a minor for which he received four months

of conditional discharge.

¶ 14    The circuit court next asked for a public safety report from the Pretrial Services Department. A pretrial officer testified that the defendant's "new criminal activity" score was two and her "failure to appear" score was three. The pretrial services recommendation was therefore "supervision level three."

¶ 15    In aggravation, the State argued that the defendant posed a real and present threat to the safety of the community and that no condition or combination of conditions of release could mitigate that threat. The State pointed out that together with Hickey, the defendant had preyed on a victim, whom she had met in a bar, and "took it upon [herself] to get his address and then basically follow him after the bar, then rob him, punch him multiple times and take his vehicle." As the State argued, if the defendant could rob and batter "a complete stranger," she was certainly a threat to the safety of the community. The State next asserted that pretrial electronic monitoring could not mitigate this safety risk because it would allow the defendant movement to go to different places and "commit these types of crimes."

¶ 16    In response, defense counsel argued in mitigation that the defendant did not pose a threat to anyone in the community because there was no indication that she was the one who committed an act of violence, since Hickey admitted to having struck the victim. In addition, counsel argued that the defendant had no prior criminal background and was given low pretrial service assessment scores with no new violent offender flag.

¶ 17    Defense counsel further pointed out that the defendant was 36 years old and diabetic, and that she had attended high school and cosmetology school but was unemployed only because she herself had been a victim of gun violence on two separate occasions (in 2021 and 2023). According to counsel, these resulted in physical injuries to the defendant, including four bullets left in her

body, which rendered her unable to work.

¶ 18    Counsel then argued that the court should impose electronic monitoring with GPS tracking because the defendant had an available address and the court could monitor her movements by way of GPS even on the days that she was statutorily allowed to leave her residence to take care of necessities. In this respect, counsel pointed out that the defendant was a life-long resident of Cook County and had resided at the same address for over ten years, where she lived with her mother and two children (ages 13 and 8). In addition, counsel asserted that because the defendant lived with her mother, she would have assistance in terms of taking care of those necessities.

¶ 19    In rebuttal, the State argued that electronic monitoring would not mitigate the risk of harm posed by the defendant because, if the defendant chose to tamper or take off her electronic monitoring bracelet, pretrial services could not "go out in the middle of the night."

¶ 20    After hearing the parties' arguments, the circuit court granted the State's petition to detain the defendant pretrial. In doing so, the court first found that the State proved by clear and convincing evidence that the proof was evident or the presumption great that the defendant committed the eligible detainable offenses of robbery and vehicular hijacking. The court observed that surveillance footage and the defendant's own admissions established that, together with Hickey, she tracked the victim down by looking at his ID, violently attacked and beat him, knocking his tooth out and knocking him unconscious, and then went through his pockets, taking his keys, wallet, and phone, and stealing his truck.

¶ 21    The circuit court next found that the defendant posed a real and present threat to the safety of the victim and the community. The court noted that even though the defendant had no prior criminal background, "this was not a crime of opportunity" but, instead, a planned and vicious attack on a targeted victim. As the court explained, "the active steps" that the defendant, together

with Hickey, took to "track [the] victim down, approach, beat him unconscious and knock a tooth out of his head, and then steal his phone, wallet and car keys, and then take the items, and then \*\*\* even more items," "absolutely make her a danger" not only to the victim in this case but to the community at large.

¶ 22 The circuit court next found that despite the mitigating evidence offered by defense counsel and her low pretrial assessment scores, which it had considered, there was no condition beyond detention that could mitigate the defendant's real and present threat to the community. The court first noted the pretrial service assessment did not take into account the "specific underlying facts of th[is] case." The court then found that home confinement and electronic monitoring (with GPS) would not deter the defendant from harming victims, possessing a gun or other weapon, or committing new crimes. The court pointed out that electronic monitoring would give the defendant two free days of movement, endangering the public. The court reiterated that electronic monitoring was intended to monitor nonviolent offenders and could only keep a check on the defendant's location and not her behavior. The court echoed that the defendant was a "violent offender" and had committed "this stalking-type robbery, beating this victim \*\*\* and leaving him unconscious while going through his pockets to steal his truck and other belongings." As such, the court concluded that the defendant required close monitoring and needed to be in the custody of the sheriff where "that level of supervision [wa]s guaranteed." Accordingly, the circuit court ordered that the defendant be detained pretrial.

¶ 23 At the next status hearing, held on September 10, 2025, defense counsel informed the court that he had intended to file the defendant's motion for relief that morning but had not completed it and would instead have it on file that afternoon. Defense counsel then asked the court to hold the matter over until the next morning for his written filing. The court acquiesced and proceeded

to address the State's discovery. After some discussion between the court and Hickey's counsel, the State asked for another month to complete discovery. At that point in the proceedings, defense counsel interjected and again reiterated that he planned to file his motion for relief later that afternoon. Of his own accord, defense counsel then offered to orally present the arguments that he anticipated filing as part of his motion for relief. The court responded that this was "okay," but that counsel should file the motion so that it was on record.

¶ 24   Defense counsel then proceeded to make three brief arguments. First, counsel asserted that it was error for the circuit court to conduct the defendant's detention hearing simultaneously to that of Hickey. Counsel argued that because the defendant had no prior criminal history, lumping her detention hearing with that of Hickey conflated his conduct and criminal background with hers, prejudicing the outcome of her proceedings. Second, defense counsel argued that given the defendant's lack of criminal history, the State failed to establish by clear and convincing evidence that she posed a real and present threat to the victim or the community and that no condition or combination of conditions could mitigate that threat. Third, defense counsel asserted that in determining that there were no conditions of release that could mitigate the defendant's threat, the detention order failed to make an individualized consideration as to the defendant and, instead, spoke about electronic monitoring in general and about Hickey's criminal background and conduct.

¶ 25   After defense counsel's arguments, the court asked the State if it wanted to respond and then agreed to hear the State's proffer of the evidence. The State argued that it was common practice to hold simultaneous pretrial detention hearings for codefendants and that this was not detrimental to the defendant in this case. Next, the State proffered that the defendant's criminal background included a 2017 sentence of supervision for criminal damage to property. The State

then recited in detail the facts underlying the instant offense and argued that, regardless of the defendant's criminal background, and because of the serious nature of the instant crime, no condition or combination of conditions could mitigate the risk of the defendant committing any more violent offenses. Specifically, the State reminded the court that the defendant had chosen the victim in a bar and then followed and attacked him as he was trying to walk to his residence, after which she took his phone, wallet and vehicle.

¶ 26    In rebuttal, defense counsel argued that the defendant's 2017 misdemeanor supervision had not been proffered at the detention hearing and that regardless, because the defendant had completed that supervision satisfactorily, the charge had resulted in a dismissal and, therefore, should not be considered part of her prior criminal background. If anything, counsel argued, this showed the defendant's compliance.

¶ 27    After hearing the parties' arguments, the circuit court upheld the original detention order. The court found that, despite a simultaneous hearing, the defendant had been afforded individualized consideration and that the facts of the instant case and the defendant's violent behavior, rather than her criminal background, were the determinative factors in the court's conclusion that she posed a danger to the public and that no condition of release could mitigate that risk, such that pretrial detention was necessary.

¶ 28    On the following day, defense counsel filed his written motion for relief pursuant to section 110-6.1 of the Act (725 ILCS 5/110-6.1 (West 2022)). Just as he had argued orally at the status hearing, in that written motion, defense counsel asserted that the circuit court erred when it: (1) conducted a simultaneous pretrial detention hearing for the defendant and Hickey; (2) determined that the defendant posed a real and present threat to the safety of any person or the community and that no condition or combination of conditions could mitigate that threat; and (3) failed to

sufficiently explain these findings in its detention order.

¶ 29    A week later, on September 17, 2025, defense counsel moved to advance the matter for a ruling on his motion. At the subsequent hearing on that motion, counsel informed the court that he did not "have much more to present that's not in writing or that [he] didn't [already] orally present." The circuit court then denied the defendant's motion for relief. In doing so, the court held that because the factual scenario underlying the defendant's and Hickey's charges in the instant case was the same, and the court considered each of them separately in making its findings, there was no error in conducting their detention hearings simultaneously. In addition, referring to its prior comments during the September 10, 2025, status hearing, the court found that the defendant posed a real and present threat to the community, that no condition could mitigate that risk, and that the original detention order sufficiently explained the reasoning for both findings.

¶ 30    The defendant now appeals, seeking her release from pretrial detention. See Ill. S. Ct. R. 604(h) (eff. Oct. 19, 2023).

¶ 31                                    II. ANALYSIS

¶ 32    At the outset, we note that under the Pretrial Fairness Act, every person charged with an offense is presumed eligible for pretrial release. 725 ILCS 5/110-2(a), 6.1(e) (West 2022). The State must file a verified petition requesting the denial of pretrial release, and the circuit court shall hold a hearing on the petition. *Id.* § 110-6.1(a). When seeking denial of pretrial release, the State bears the burden of proving by clear and convincing evidence that (1) the proof is evident or presumption great that the defendant committed a detainable offense; (2) the defendant poses a real and present threat to the safety of any person, persons, or the community, based on the specific, articulable facts of the case; and (3) no condition or combination of conditions can mitigate the

real and present threat to the safety of any person or persons or the community, or prevent the defendant's willful flight from prosecution. *Id.* § 110-6.1(e)(1)-(3).

¶ 33   Where the circuit court orders pretrial detention, to appeal, the defendant must first file a motion for relief with the circuit court requesting the same relief that will eventually be sought on appeal. Ill. S. Ct. R. 604(h)(2) (eff. April 15, 2024); see also 725 ILCS 5/110-6.1(i-5) (West 2022) (the circuit court must determine that continued detention is necessary at each subsequent appearance).

¶ 34   Our review of a circuit court's pretrial detention order is dependent upon the type of evidence presented at the detention hearing. See *People v. Morgan*, 2025 IL 130626. As our supreme court has recently held, where live witness testimony is presented, "the circuit court's ultimate detention decision *** in addition to any underlying factual findings supporting th[at] decision, will not be disturbed on review unless found to be contrary to the manifest weight of the evidence." *Morgan*, 2025 IL 130626, ¶ 54. However, if the hearing proceeds solely by proffer, "the reviewing court is not bound by the circuit court's factual findings and may therefore conduct its own independent *de novo* review of the proffered evidence and evidence otherwise documentary in nature." *Id.*

¶ 35   Because the underlying detention hearings here did not involve any live witness testimony, we accord no deference to the circuit court and review its decision to detain the defendant pretrial *de novo*. *Id*. ¶¶ 21-22.

¶ 36   In the present case, instead of an appellate brief, the defendant filed a notice in lieu of her Rule 604(h) memorandum stating her intention to rely solely on the arguments raised in her motion for relief, but adding two additional arguments not raised therein.

¶ 37    We begin by addressing the arguments raised in the defendant's motion for relief filed before the circuit court. In this respect, the defendant first argues that the circuit court erred in conducing her pretrial detention hearing simultaneously to that of Hickey. The defendant concedes that "nothing in the [Act] explicitly prohibits" the court from holding simultaneous detention hearings for multiple defendants, but asserts that because she had no prior criminal background and was not the one who beat the victim unconscious, she was prejudiced by having her detention hearing held simultaneously to that of Hickey here.

¶ 38    At the outset, we note that the defendant has forfeited this issue by not objecting to it before the circuit court. A criminal defendant who fails to object to an alleged error forfeits its appellate review. *People v. Cooper*, 2025 IL 130946, ¶ 22. This forfeiture rule prevents a criminal defendant from sitting idly by and knowingly allowing an irregular proceeding to go forward only to seek reversal due to the error when the outcome of the proceeding is unfavorable. *People v. Jackson*, 2022 IL 127256, ¶ 15. The rationale for the rule is simple: failure to raise the issue deprives the trial court of any opportunity to take corrective action, thereby wasting time and judicial resources. *Id.*

¶ 39    Forfeiture aside, we find nothing improper about the manner in which the defendant's detention hearing was conducted. Given that most of the purported acts here occurred in tandem and were part and parcel of one and the same incident, it was not unreasonable for the circuit court to have heard the two detention hearings together. Moreover, the defendant and Hickey were represented by separate defense attorneys, who were able to present individualized arguments as to their respective clients. What is more, in granting the State's petition for pretrial detention, the court distinguished the defendant from her accomplice. Specifically, relying on the Sate's proffer regarding the surveillance camera footage, the court noted that she sought the victim in the bar,

beat him (separate from Hickey), and took his stolen cellphone to Walmart, and that she had also driven the victim's truck to the alley on her own and removed items from it. The court further added that, unlike her accomplice, the defendant had no criminal background. Where these same facts would have been proffered by the State and considered by the court at a separate detention hearing, we fail to see how the defendant was disadvantaged by the instant simultaneous proceeding. Accordingly, we find no error. See *e.g.*, *People v. Hall*, 2025 IL App (1st) 250684-U (holding that it was not improper for the circuit court to hold joint and combined pretrial detention hearings on the State's petitions for five separate codefendants who had acted in tandem); *People v. Brame*, 2024 IL App (1st) 240363-U (holding that the circuit court did not improperly "lump" one codefendant with another in making its detention determinations).

¶ 40     The defendant next argues that the State failed in its burden to establish by clear and convincing evidence that she posed a real and present threat to the safety of the community. In this respect, she asserts that in the absence of any prior criminal background, the State's reliance on the alleged conduct for which she was charged, without more, was insufficient to establish her dangerousness. We disagree.

¶ 41     The Act provides a non-exhaustive list of factors that the circuit court may consider in assessing the defendant's "dangerousness," including, *inter alia*: the nature and circumstances of the offense; the defendant's history and characteristics; the nature of the threat posed by the defendant; any statements made by the defendant; whether the defendant has access to weapons; and any other factors with a reasonable bearing on the defendant's propensity for violent behavior. See 725 ILCS 5/110-6.1(g) (West 2022).

¶ 42     In the present case, after a review of the record, we find that the State met its burden in showing that the defendant posed a threat to the safety of both the victim and the community. To

that point, the record reveals that the nature and circumstances of the offense were both calculated and violent, and that the defendant admitted to her own actions. Specifically, the defendant admitted to purposefully taking note of the victim's address by looking at his ID while he was in the bar and then following him when he left. She also identified herself in surveillance footage which captured her striking the victim several times, then callously going through his pockets as he lay on the ground unconscious, and taking his cell phone, wallet and car keys before driving off in his truck. Given the premediated nature of the crime and the defendant's reckless disregard for the victim's safety, we find nothing erroneous in the circuit court's conclusion that regardless of her lack of criminal background, "the active steps" the defendant took to "track [the] victim down, approach, beat him unconscious and knock a tooth out of his head, and then steal his phone, wallet and car keys, and then take the items, and then *** even more items" "absolutely make her a danger" not only to the victim in this case but to the community at large. See *e.g.*, *People v. Watson*, 2025 IL App (1st) 251710-U, ¶ 17 (holding that while "the inherent danger presented by the offense is insufficient cause to deny pretrial release," a court is "entitled to consider the facts and circumstances of the offense" in determining the defendant's dangerousness to the public).

¶ 43    The defendant next argues that there were conditions of release that could have mitigated her safety threat to the public, namely, electronic monitoring with GPS, and that the State failed to meet its burden with respect to this element by solely relying on the charges against her. Again, we disagree.

¶ 44    In determining whether pretrial release conditions would reasonably ensure the safety of the public, courts must consider "the *likelihood* of compliance by the defendant with all conditions of pretrial release." (Emphasis added.) 725 ILCS 5/110-5(a)(3)(A)-(B) (West 2022).

Section 110-5 of the Act lists the factors that the circuit court may consider in making this determination. 725 ILCS 5/110-5 (West 2022). These factors mirror those the court can consider in determining the defendant's "dangerousness," and include, *inter alia*: the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; and the nature and seriousness of the safety threat that would be posed by the defendant's release. 725 ILCS 5/110-5(a)(1), (2), (4) (West 2022); *People v. Saucedo*, 2024 IL App (1st) 232020, ¶ 49; *People v. Jones*, 2023 IL App (4th) 230837, ¶ 32; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 31.

¶ 45    Here, all three factors weigh heavily against the defendant's release. The premeditated, callous and violent nature of the defendant's conduct undermines any confidence that she would comply with conditions of release and refrain from targeting either this victim or other potential, similar victims in the community. As already noted above, the defendant here targeted the victim, followed him from a bar, and then beat and robbed him as he lay unconscious. What is more, the defendant then proceeded to drive off with the victim's truck, whereupon she stole more possessions from it. Under this record, we find nothing erroneous in the circuit court's conclusion that electronic monitoring (with GPS), which requires two days of free movement, would not deter the defendant from attacking this victim or committing similar premediated and violent "stalking-type" robberies.

¶ 46    In coming to this conclusion, we find the defendant's reliance on the decision  in *People v. Lopez*, 2025 IL App (2d) 240709, misplaced. In that case, the 18-year-old defendant was charged with illegal possession of a firearm without a firearm owner's identification (FOID) card and the circuit court ordered his pretrial detention. *Id*. ¶ 3. The appellate court reversed, finding that the State had failed to show that there were no conditions of release that could mitigate the defendant's safety threat to the public. *Id*. ¶ 20. In doing so, the court found relevant that the defendant had no

prior criminal background, lived at home with his family, was not affiliated with any gang, and that "there was no evidence [whatsoever] that the defendant ever used a firearm or had a history of violent behavior." *Id*.

¶ 47    Unlike in *Lopez*, the instant crime was not victimless. Instead, the State's proffered evidence unequivocally established that the nature of the defendant's targeted and violent attack on the victim, which left him unconscious and toothless, required her constant supervision. Accordingly, *Lopez* does not apply.

¶ 48    The defendant further argues that the circuit court's written detention order failed to properly explain its findings regarding why she posed a real and present threat to the safety of the community and why less restrictive conditions would not mitigate that threat. Specifically, she asserts that the detention order speaks in generalities when describing her dangerousness and the inadequacy of electronic monitoring and GPS in mitigating that threat. We disagree.

¶ 49    Pursuant to section 110-6.1(h)(1) of the Act, the circuit court must "make a written finding summarizing the court's reasoning for concluding that the defendant should be denied pretrial release[.]" 725 ILCS 5/110-6.1(h)(1) (West 2022). In evaluating the sufficiency of a written detention order, the circuit court's written findings may be read in conjunction with its oral pronouncement, so long as the oral ruling is specific and thorough. See *People* v. *Vance,* 2024 IL App (1st) 232503, ¶ 28-32. "Decisions regarding release, conditions of release, and detention prior to trial must be *individualized,* and no single factor or standard may be used exclusively to order detention." (Emphasis added.) 725 ILCS 5/110-6.1(f)(7) (West 2022).

¶ 50    Contrary to the defendant's position, we find that when read in conjunction with its oral pronouncement, the circuit court's written order could not have been more specific. According to the court, the defendant posed a threat to the public because the instant crime was violent and

premediated. The court found that the defendant, specifically, planned to rob the victim, viciously attacked him and then went through his pockets while he lay unconscious, before driving off in his truck. Moreover, "this was not a crime of opportunity," but instead a planned and vicious attack on a targeted victim, and the "the active steps" that the defendant took in planning and executing this robbery "absolutely ma[d]e her a danger" to both the victim and the public. The court similarly found that because of the violent nature of the instant offense, home confinement and electronic monitoring (with GPS), which allowed at least two days of free movement, would not prevent the defendant from harming additional victims, committing new offenses, or possessing a gun or other weapon. The court further noted that, in coming to this conclusion, it had considered the defendant's lack of criminal background and her low pretrial assessment scores but, nonetheless, believed that under the specific facts of this case, only pretrial detention could mitigate the risk of harm to the public she posed. Under this record, we are compelled to conclude that the court's ruling was both detailed and specific to defendant and that it therefore sufficiently articulated the court's rationale for concluding that pretrial detention was necessary.

¶ 51 Having disposed of the defendant's complaints regarding her detention hearing and determination, we next turn to the arguments raised in her notice in lieu of her Rule 604(h) memorandum regarding the fairness of the motion for relief proceedings. In this respect, the defendant first asserts that she was prejudiced by the circuit court's decision to conduct her motion for relief hearing before a written motion was filed.

¶ 52 The defendant misconstrues the record. Contrary to her position here, the transcript from the September 10, 2025, status hearing reveals that the circuit court did not hold a motion for relief hearing prior to that motion's filing. Instead, the court merely entertained defense counsel's oral arguments previewing that motion. What is more, it was defense counsel who, wholly of his own

accord, repeatedly asked the court to allow him to present those arguments orally before filing his written motion. While it is true that the circuit court then inquired if the State wanted to respond and accepted the State's proffer and arguments, it also instructed defense counsel to file his written motion and indicated that it would subsequently rule on it. The transcript of the proceedings further reveals that, after defense counsel subsequently filed his written motion for relief, he advanced that motion for the court's ruling. When he did so, defense counsel explicitly informed the court that he had nothing more to add to the pleading which he had not orally previewed. It was only then that the circuit court denied the defendant's motion. Under this record, we find that the defendant was neither deprived of an opportunity to present her arguments nor prejudiced by the circuit court's conduct. If anything, she was given not one, but two, opportunities to argue why she should be released from pretrial detention.

¶ 53    Finally, in a last-ditch effort to overturn her pretrial detention, the defendant asserts that the circuit court improperly permitted the State to proffer new evidence regarding her criminal background at the motion for relief hearing. Specifically, the defendant points out that at the detention hearing the State conceded she had no prior punishable background, but at the motion for relief hearing it proffered she was given supervision in 2017 for criminal damage to property.

¶ 54    While we agree with the defendant that a when deciding a motion for relief the court should only consider evidence offered "at the initial detention hearing," we nonetheless find that any error here was harmless because the circuit court's determination, as well as our own, would be the same regardless of that additional, and only minor, piece of evidence. *People v. Williams*, 2024 IL App (1st) 241013, ¶ 28. In this respect, we observe that, after noting the defendant's 2017 supervision, the State subsequently argued that regardless of any criminal background, it was the defendant's calculated and violent conduct in the instant case that rendered her a threat to the community and

required her detention to alleviate that threat. We agree with that assessment and therefore find nothing erroneous in the circuit court's order denying the defendant's motion for relief.

¶ 55                                III. CONCLUSION

¶ 56    For these reasons, we affirm the judgment of the circuit court.

¶ 57    Affirmed.